CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

APR 09 2012

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

BRENDA C. ALTMAN )
)
     Plaintiff, )    Civil Action No. 5:11cv00061
v. )
)
JOHN MCHUGH, ) By:  Michael F. Urbanski
SECRETARY OF THE ARMY, )     United States District Judge
)
     Defendant. )

## MEMORANDUM OPINION

Before the court is defendant John McHugh, Secretary of the Army's, ("the Army")

Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (Dkt. # 18). The Army

has also filed a Motion to Compel Discovery and for Sanctions (Dkt. # 36), and pro se plaintiff

Brenda Altman ("Altman") has filed several motions that are currently pending before the court.

These motions are as follows: (1) Motion for Change of Court Date for Expert Witness to

Appear (Dkt. # 34); (2) Motion for Continuance and Response to [Q]uash Motions to Dismiss or,

in the Alternative, [Q]uash Motions for Summary Judgment (Dkt. # 41); (3) Motion for Default

Judgment and Opposition to Defendant's Summary Judgment Request and Answer to Motion for

Compelling Discovery and Answer to Court's Order to Answer Defendant's Pleadings (Dkt. #

46); (4) Motion for Order Compelling Discovery and/or for Sanctions and Motion for Order to

Answer Plaintiff's Interrogatories (Dkt. # 47), and (5) Motion for an Order to Show Cause (Dkt.

# 57). In total there are seven pending motions currently before the court. All of these matters

have been fully briefed, and the court heard oral argument on January 23, 2012. Because

Altman's complaint fails to state plausible claims for relief, the Army's motion to dismiss must

be granted. Accordingly, the other six motions filed by the parties are denied as moot.

Altman is suing the Army for age and sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act of 1967 ("ADEA"). Her complaint in this court also alleges discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA") and the Rehabilitation Act of 1973 ("Rehabilitation Act"). This case has a very complicated procedural history. Altman was employed as a GS-7 Audit Assistant[1] with the U.S. Army Corps of Engineers, Transatlantic Programs Center, in Winchester, Virginia ("the facility"), from November 1991 until 1999. On March 13, 1995, she contacted an Equal Employment Opportunity ("EEO") counselor at the facility with four complaints: (1) she was not promoted to the position of auditor; (2) she was not provided the proper training to receive promotion; (3) she had wrongfully received a rating of "fair" instead of "successful" on her 1994 performance evaluation; and (4) she had been harassed by Carroll Correll, her supervisor and chief of the Audit Office. On June 6, 1995, Altman included these four allegations in two formal complaints filed with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination in violation of Title VII and the ADEA. These EEOC cases are 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X and 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X.

After an administrative hearing, Administrative Law Judge Rebecca Dickinson ("Judge Dickinson") issued a decision on July 30, 1999, in which she made the following findings. First, regarding Altman's allegations of non-promotion and improper training for promotion, Judge Dickinson held that the claims were untimely because Altman did not timely submit her complaints to the EEO counselor as required by 29 C.F.R. § 1614.105(a)(1).[2] These two

---

[1] Altman's title and position later changed to "Program Analyst."

[2] This EEOC regulatory provision states that "[a]ggrieved persons who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age, disability, or genetic information must consult with a

2

complaints are based on what Altman claims to be the illegal promotion of her co-worker Paul

Rosensteel, which occurred in 1992 and 1993, but Altman did not contact the EEO counselor at

the facility until 1995, which is well beyond the regulatory forty-five-day mandatory time frame.

Second, regarding Altman's allegation of harassment by Carroll Correll, Judge Dickinson

determined that the relevant time period for this alleged misconduct was from 1994 through the

filing of Altman's EEOC complaints in 1995, but Judge Dickinson then held that "[t]here is no

probative evidence connecting Correll's conduct to [Altman's] age or sex." EEOC Findings and

Conclusions, Dkt. #1, Ex. 33, at 8. Judge Dickinson held that Altman had not met her burden of

proof regarding her allegations of discriminatory conduct by Carroll Correll. Finally, regarding

Altman's allegation that she wrongfully received a "fair" rating on her 1994 performance

evaluation, Judge Dickinson found that this claim had merit and held that Altman's 1994

performance rating was lowered in retaliation for her EEO activity and that the Army was

therefore liable for discrimination under Title VII. Accordingly, Judge Dickinson ordered (1)

that the Army raise Altman's performance evaluation rating from "fair" to "successful"; (2) that

the Army pay Altman's reasonable attorney's fees and costs insofar as they are attributable to the

portion of the case on which she prevailed;[3] (3) that the Army post a specific "Notice to

Employees" at the facility; and (4) that the Army promptly require Carroll Correll to undergo

thorough training in the nondiscrimination and nonretaliation principles of Title VII and the

ADEA. Judge Dickinson then scheduled a separate evidentiary hearing to consider Altman's

request for compensatory damages.

---

Counselor prior to filing a complaint in order to try to informally resolve the matter." 29 C.F.R. § 1614.105(a). The provision further provides that this contact with an EEO counselor must be initiated "within 45 days of the date of the matter alleged to be discriminatory or, in the case of a personnel action, within 45 days of the effective date of the action." § 1614.105(a)(1). This forty-five-day period can be extended in certain limited circumstances, none of which Judge Dickinson found to exist in Altman's case. See § 1614.105(a)(2).

[3] This indicates that Altman was represented by counsel at the administrative hearing.

3

The evidentiary hearing on compensatory damages was held on August 26, 1999. On September 7, 1999, Judge Dickinson ordered that Altman should receive (1) an award of $3,000 for nonpecuniary damages based on Altman and her son's testimony regarding her emotional distress due to the discriminatory performance evaluation;[4] (2) reimbursement for forty hours of sick leave that Altman used immediately after receiving the discriminatory performance evaluation; and (3) reimbursement for her attorney's fees incurred in representing her at the compensatory damages hearing.[5] After this ruling by Judge Dickinson, the Army issued a Final Agency Decision ("FAD") on November 8, 1999, in which it adopted Judge Dickinson's findings on the merits and on compensatory damages, as well as the recommended remedies. This FAD provided Altman with instructions for requesting reimbursement for attorney's fees, as ordered by Judge Dickinson, and for appealing the Army's FAD.

Altman timely appealed the Army's FAD to the EEOC's Office of Federal Operations ("OFO") on December 15, 1999. While the OFO was considering the appeal, the Army issued a second FAD on September 27, 2000, awarding Altman $20,511.59 in attorney's fees and costs, in accordance with Judge Dickinson's order, for pursuing her claim for discriminatory retaliation based on the 1994 performance evaluation. Altman appealed this decision to the OFO as well, which consolidated the two appeals and issued its final decision on June 20, 2002. The OFO's final decision affirmed the Army's FADs on all grounds and upheld Judge Dickinson's ruling on the merits, found that the compensatory damages award was consistent with EEOC precedent,

---

[4] In some of her pleadings, Altman references this compensatory damages hearing and asserts that Judge Dickinson did not let her present evidence regarding her pecuniary damages, such as medical bills and other documents related to financial losses. Judge Dickinson's opinion references this grievance and notes that such evidence was excluded because Altman and her attorney did not comply with court orders regarding the deadlines for serving and submitting exhibits for the hearing. Judge Dickinson also notes that Altman's attorney objected to the exclusion of these documents but that the objection was overruled.

[5] This indicates, and Judge Dickinson's opinion affirms, that Altman was represented by counsel at the compensatory damages hearing.

4

and held that the attorney's fee award was reasonable and proper. Before this final decision was issued, however, Altman filed a complaint in the United States District Court for the District of Columbia ("D.C. district court") on February 7, 2001, thus beginning the current litigation.

While the administrative proceedings described above were pending with the EEOC, the Army removed Altman from her Program Analyst position on June 10, 1999, for unacceptable performance. Altman appealed this removal decision to the Merit Systems Protection Board ("MSPB"), and she entered into a settlement agreement with the Army on August 18, 1999.[6] The settlement agreement stated that the Army would pay Altman $59,000, and in return Altman agreed to withdraw two of her many pending EEO complaints. Those EEO complaints are FO9904J0010 and FO9906J0020.[7] EEO complaint FO9904J0010 involves allegations of reprisal and illegal conduct by the Army throughout what Altman refers to as (1) her "upward mobility" year, during which she was trained for her new Program Analyst position (from which she was later removed), and (2) her "performance improvement plan" period. EEO complaint FO9906J0020 involves allegations of (1) retaliation based on Altman's 1998 appraisal, which is dated April 5, 1999, and (2) reprisal and illegal conduct by the Army during Altman's upward mobility year and performance improvement plan period. In both EEO complaints, Altman essentially alleges that she was improperly removed from the Program Analyst position because she was not given the proper training for the position and was then unfairly evaluated on the knowledge of the position. The MSPB judge accepted the settlement agreement and dismissed Altman's MSPB appeal on August 19, 1999. The Army issued a settlement check in the amount of $59,000 on September 20, 1999, and mailed the check to Altman with a letter dated

---

[6] The settlement agreement notes that Altman was represented by counsel.

[7] These complaints are different from the other EEOC complaints that were pending at the same time before Judge Dickinson.

5

September 29, 1999. More than ten years later, Altman denies receipt of the settlement proceeds.[8]

Altman subsequently complained to the MSPB that the Army had violated the nondisclosure terms of the settlement agreement, but the MSPB, in a decision issued on October 18, 2000, found that the Army had not breached the agreement. Altman then appealed this ruling to the United States Court of Appeals for the Federal Circuit. The Federal Circuit, in an opinion dated June 7, 2001, noted its exclusive jurisdiction over Altman's appeal of the MSPB's final decision and then affirmed the MSPB's ruling that the settlement agreement between the Army and Altman was valid and that the Army had not violated the terms of that agreement.[9]

This brings us to Altman's pending litigation in this court, which stems from her complaint filed in the D.C. district court on February 7, 2001. On December 15, 2003, that court

---

[8] At oral argument on January 23, 2012, Altman denied that she cashed a settlement check from the Army, but she could not provide documentation to support her contention that she never received the money. The Army provided the court with copies of the settlement check and accompanying letter it sent to Altman on September 29, 1999, but it could not provide documentation to prove that the check had indeed been cashed. The court suggested that Altman contact her former attorney to investigate the whereabouts of the settlement check. At oral argument, Altman further asserted that she never accepted the Army's settlement offer because she did not want to withdraw all of her pending EEO complaints, but Altman's signature, dated August 18, 1999, appears on the settlement agreement.

On March 30, 2012, Altman filed a Memorandum of Notice (Dkt. # 56) with the court, in which she states that since oral argument on January 23, 2012, she has contacted her former attorney, Robert L'Heureux, concerning the $59,000 settlement check from the Army. Altman states that Mr. L'Heureux told her that he never received a settlement check from the Army, that he does not recall such a check being issued, and that, because their attorney–client relationship ended, he never pursued the issue with the Army. Altman then reiterates that she never intended to accept the Army's settlement offer because she did not want to withdraw all of her pending EEO complaints.

On April 4, 2012, Altman filed a Motion for an Order to Show Cause (Dkt. # 57), in which she reiterates that she never received and cashed the $59,000 settlement check. In this motion, Altman admits to signing the settlement agreement with the Army because her attorney informed her that it did not include the withdrawal of all of her EEO complaints. In the motion, Altman seems to express confusion over the purpose of the settlement agreement and what it was intended to cover. Altman concludes by requesting an order from the court requiring the Army to provide proof that she received and cashed the disputed settlement check.

While the confusion regarding the $59,000 settlement check concerns the court, the court does not have jurisdiction to review the terms and conditions of the signed settlement agreement between Altman and the Army, the validity of that agreement, or the parties' performance of their obligations pursuant to the agreement. As will be explained in this opinion, the United States Court of Appeals for the Federal Circuit has exclusive jurisdiction to adjudicate all issues related to the settlement agreement, and it has exercised such jurisdiction and upheld the validity of that agreement.

[9] The Federal Circuit's exclusive jurisdiction is derived from 28 U.S.C. § 1295(a)(9) and 5 U.S.C. § 7703(b)(1).

ordered that venue be transferred to the United States District Court for the Western District of Virginia, but the record was not transferred until July 5, 2011, about seven and a half years later. It appears that the record was not timely transferred to the Western District of Virginia in 2003 and was instead lost for a period of years until 2011 when the oversight was noticed and the case was properly transferred to this court.

After receiving the case, this court held an initial hearing on September 20, 2011, to determine the status of the litigation and the reason for the long delay in its prosecution. Although it is the fault of the D.C. district court for not properly transferring venue back in 2003, Altman admitted at the September 2011 hearing that she never attempted to contact that court to ascertain the location of the correct venue or the status of her litigation. In fact, after a couple of years she thought that her case was over, and she proceeded to destroy most of her documents and evidence. At oral argument on January 23, 2012, Altman's version of events changed slightly, and she recounted some contact with the D.C. district court after the venue order was entered. Altman stated that, after the court ordered that venue be transferred to the Western District of Virginia, she went to the D.C. district court to pick up a box of documents from the clerk's office. She also stated that she called the clerk's office once and spoke with a woman who informed Altman that she was unable to help her determine the new venue for her case because she was not an attorney. Altman indicated that she also talked to the clerk's office in person regarding the transfer of venue, but she could not remember when this interaction occurred, to whom she spoke, or what she was told. Altman claimed that she never received a transfer order from the D.C. district court notifying her of the change in venue. She conceded, however, that she never filed any motions or sent any letters to the D.C. district court to ascertain the status or whereabouts of her case. Now that the matter has finally been properly transferred

7

to this court, Altman wishes to pursue her original claims contained in her complaint from February 2001. To date, Altman has been timely and diligent in pursuing those claims in this court.

Altman's lengthy complaint includes multiple allegations of misconduct spanning many years and a number of forums. The allegations in her complaint reflect the same allegations of discrimination and retaliation that were contained in her EEOC complaints before Judge Dickinson and her EEO complaints before the MSPB that were previously adjudicated or settled. The complaint contains numerous related descriptions of discrimination and retaliation, but these allegations appear to be indistinguishable from the discriminatory and retaliatory conduct that was the subject of Altman's previous administrative proceedings. In addition, in the last paragraph of her complaint, Altman asserts, for the first time, that these misdeeds also violate the ADA and the Rehabilitation Act. For all of the allegations in her complaint, Altman does not allege any facts to indicate that she timely exhausted administrative remedies. The Army has moved to dismiss Altman's complaint or, in the alternative, that it be granted summary judgment. The Army asserts four grounds upon which Altman's complaint can be dismissed: (1) failure to prosecute, (2) failure to exhaust administrative remedies, (3) the principles of accord and satisfaction and res judicata, and (4) failure to state a plausible claim for relief.

## II

The Army first argues that Altman's entire complaint should be dismissed for failure to prosecute pursuant to Federal Rule of Civil Procedure 41(b). Rule 41(b) states that "[i]f the plaintiff fails to prosecute or to comply with the[ Federal Rules of Civil Procedure] . . . or a court order, a defendant may move to dismiss the action or any claim against it. Unless the dismissal order states otherwise, a dismissal under this subdivision (b) . . . operates as an adjudication on

8

the merits." FED. R. CIV. P. 41(b). This type of dismissal is an involuntary dismissal. The Fourth Circuit Court of Appeals has identified four factors to be considered before dismissing a case pursuant to Rule 41(b) for failure to prosecute: "(1) the plaintiff's degree of personal responsibility; (2) the amount of prejudice caused the defendant; (3) the presence of a drawn out history of deliberately proceeding in a dilatory fashion; and (4) the effectiveness of sanctions less drastic than dismissal." Hillig v. C.I.R., 916 F.2d 171, 174 (4th Cir. 1990). These factors "do not present a rigid balancing test or specific facts that must be found before involuntary dismissal is appropriate. Rather, 'the propriety of a dismissal of th[is] type . . . depends on the particular circumstances of the case.'" Medlin v. Trull, No. 3:03-269, 2006 WL 435941, at *1 (W.D.N.C. Feb. 21, 2006) (quoting Ballard v. Carlson, 882 F.2d 93, 95 (4th Cir. 1989)). While "[p]ro se litigants are entitled to some deference from courts[,] . . . they as well as other litigants are subject to the time requirements and respect for court orders without which effective judicial administration would be impossible." Ballard, 882 F.2d at 96 (internal citation omitted).

The Army claims that even though the D.C. district court failed to transfer venue to the Western District of Virginia until July 2011 after ordering that venue be transferred in December 2003, Altman did nothing to prosecute her case during that seven and a half year period. While conceding that the D.C. district court made a mistake by failing to timely transfer venue, the Army asserts that the responsibility is ultimately on Altman as plaintiff to pursue her claims. The Army also avers that it will suffer great prejudice if this litigation continues because Altman destroyed most of her documentation a few years after she was unable to determine the new venue of her case, the events alleged in the complaint occurred as far back as 1992, and many of the key witnesses no longer work for the Army or will be unable to remember the relevant events

9

in order to testify. The Army claims that there is no sanction less drastic than dismissal that responds to Altman's dilatory behavior and prevents further prejudice to the Army.

Although the court agrees that Altman could have done more to prosecute her claims from December 2003 until July 2011 and that the Army will be prejudiced if the litigation continues, the failure of the D.C. district court to timely transfer venue and Altman's status as a pro se litigant prevent the court from dismissing this action for failure to prosecute. The responsibility for the extreme delay in the prosecution of this case falls squarely on the D.C. district court and its failure to transfer venue to the Western District of Virginia until seven and a half years after ordering such transfer. After the court ordered that venue be transferred, Altman concedes that she never filed any motions or wrote any letters to the D.C. district court to determine the proper venue, but she did contact the clerk's office in an attempt to ascertain the proper venue for her case. The court affords Altman some deference in light of her pro se status and in light of the neglect of the D.C. district court itself in properly transferring the matter. Since her case has been transferred to the Western District of Virginia, Altman has been timely and diligent in pursuing her claims in this court, which suggests that she would have been equally as timely and diligent seven and a half years ago had the D.C. district court transferred the matter at that time.

In Snyder v. Hopkins, No. 89-6623, 89-7613, 888 F.2d 1387, 1989 WL 126742 (4th Cir. Oct. 20, 1989), the Fourth Circuit remanded a case to the district court, but the case was not reinstated on the district court's active docket until almost two years after remand was ordered. Id. at *1. Shortly after the case was reinstated, the district court dismissed the claims for failure to prosecute because the pro se plaintiff had not had any contact with the court since the remand order was issued two years prior. Id. Additionally, the district court stated that another ground

for involuntary dismissal was the plaintiff's failure to comply with a court order requiring him to notify the court of his new address after he was paroled. Id. On appeal, the Fourth Circuit held that, given the plaintiff's pro se status, dismissal for noncompliance with the court order concerning change of address was an abuse of discretion because the plaintiff was never warned about the potential consequences of failing to comply with a court order. Id. The Fourth Circuit also found that the district court's dismissal for failure to prosecute was an abuse of discretion. Id. at 2. The court recognized the lack of prejudice to the defendants but noted the lack of evidence that the district court considered less severe sanctions and the responsibility of the district court for the significant delay in the prosecution of the case after remand was ordered. Id. The Fourth Circuit stated as follows:

> Any litigant reading our [remand] opinion . . . would expect that he was required to do nothing to reactivate the case. Rather, the litigant would assume that it was the court's responsibility to take the necessary steps to resume consideration of the case. . . . [T]he court bears a considerable amount of the blame for the delay. Prompt action in accordance with our remand order would in all probability have resulted in a resolution on the merits . . . .

Id. In this case, as in Snyder, the D.C. district court bears a considerable amount of the blame for the delay in the prosecution of Altman's claims. Moreover, unlike the plaintiff in Snyder, Altman has complied with all court orders to the best of her ability, attended all scheduled hearings, and remained in constant communication with the court since the case was transferred in July 2011.

The court recognizes that allowing this litigation to continue so long after the alleged events occurred may cause prejudice to the Army, but "[t]he operative condition for a Rule 41(b) motion is lack of due diligence on the part of the plaintiff, not a showing by defendant that it would be prejudiced." West v. City of N.Y., 130 F.R.D. 522, 526 (S.D.N.Y. 1990) (internal quotations omitted). Despite the significant delay in the prosecution of this case, the court finds

11

that Altman has not exhibited the necessary lack of due diligence to warrant involuntary dismissal of her case, and a "'court must not let its zeal for a tidy calendar overcome its duty to justice . . . .'" Id. (quoting David v. United Fruit Co., 402 F.2d 328, 331 (2d Cir. 1968)). Nevertheless, even though Altman's complaint cannot be dismissed for failure to prosecute, it may still be dismissed on other grounds.

### III

Nearly all of the allegations in Altman's complaint must be dismissed for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). "The plaintiff has the burden of proving that subject matter jurisdiction exists." Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp., 166 F.3d 642, 647 (4th Cir. 1999) (citing Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991)). Thus, "[w]hen a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), 'the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" Id. (quoting Richmond, Fredericksburg & Potomac R.R. Co., 945 F.2d at 768).

Title VII "creates a right of action for both private-sector and certain federal employees alleging discrimination on the basis of race, color, religion, sex, or national origin. All employees . . . alleging such discrimination must, however, exhaust their administrative remedies before exercising this right." Laber v. Harvey, 438 F.3d 404, 415 (4th Cir. 2006), on subsequent appeal, No. 07-1946, 316 F. App'x 266, 2009 WL 631606 (4th Cir. Mar. 12, 2009), cert. denied, 130 S. Ct. 561 (2009) (internal citation omitted). Therefore, before Altman can pursue her Title VII employment discrimination claim in federal court, she must exhaust her administrative remedies. Title 42, Section 2000e-5(e)(1) is the applicable "charge filing provision that

12

'specifies with precision' the prerequisites that a plaintiff must satisfy before filing suit." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002) (quoting Alexander v. Gardner-Denver Co., 415 U.S. 36, 47 (1974)). It provides as follows:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge . . . shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred . . . .

42 U.S.C. § 2000e-5(e)(1). These 180 and 300-day time limits also apply to claims under the ADEA, the ADA, and the Rehabilitation Act, violations of which Altman has alleged in her complaint. 29 U.S.C. § 626(d)(1); see 29 U.S.C. § 794(d); see also 42 U.S.C. § 12117(a); see also Ali v. State of Md., No. 94-1683, 48 F.3d 1215, 1995 WL 88955, at *2 (4th Cir. Mar. 6, 1995).[10] "[F]ailure to timely file a charge of discrimination with the EEOC prohibits a federal court action on that claim." Ali, 48 F.3d 1215, 1995 WL 88955 at *2. Regarding these "timely filing requirements of Title VII" the Supreme Court of the United States has stated that "'strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.'" Nat'l R.R. Passenger Corp., 536 U.S. at 108-09 (2002) (quoting Mohasco Corp. v. Silver, 447 U.S. 807, 826 (1980)). The Court has further stated that "'[b]y choosing what are obviously quite short deadlines, Congress clearly intended to encourage the prompt processing of all charges of employment discrimination.'" Id. at 109 (quoting

---

[10] Under 29 U.S.C. § 794(d), the Rehabilitation Act expressly incorporates the standards of the ADA. Spencer v. Ashcroft, No. 04-1955, 147 F. App'x 373, 375, 2005 WL 2295512, at **2 (4th Cir. Sept. 21, 2005). Pursuant to 42 U.S.C. § 12117(a), the ADA, in turn, follows the "powers, remedies and procedures" set forth in Title VII, id., which includes the requirement that a plaintiff exhaust her administrative remedies before filing an action for employment discrimination in federal court. The ADEA, through 29 U.S.C. § 626(d)(1), also requires that a plaintiff exhaust her administrative remedies according to the same time limits proscribed under Section 2000e-5(e)(1) before proceeding in federal court.

13

<u>Mohasco Corp.</u>, 447 U.S. at 825). Accordingly, "[a] claim is time barred if it is not filed within the[ appropriate] time limit[]." <u>Id.</u> Upon the timely filing of a charge of discrimination with the EEOC, federal employees must also pursue their claims through the administrative process in order to properly exhaust their administrative remedies before filing suit in federal court. <u>See</u> <u>Laber</u>, 38 F.3d at 415-17.

This requirement of timeliness, however, begins before a plaintiff files a formal charge with the EEOC within the 180 and 300-day time limits specified in Section 2000e-5(e)(1). Before filing a formal charge with the EEOC, federal regulations first require an employee to consult an EEO counselor. Title 29, Section 1614.105 of the Code of Federal Regulations states that "[a]ggrieved persons who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age, disability, or genetic information must consult with a Counselor prior to filing a complaint in order to try to informally resolve the matter." 29 C.F.R. § 1614.105(a). The regulation further provides that this contact with an EEO counselor must be initiated "within 45 days of the date of the matter alleged to be discriminatory or, in the case of a personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1). This forty-five-day period can be extended in certain limited circumstances, such as when an employee "was not notified of the time limits and was not otherwise aware of them," when an employee "did not know and [it] reasonably should not have been known that the discriminatory matter or personnel action occurred," when an employee "despite due diligence . . . was prevented by circumstances beyond his or her control from contacting the counselor within the time limit," or when there are "other reasons considered sufficient by the agency or the Commission." 29 C.F.R. § 1614.105(a)(2).

Because Altman's allegations are against the Army, and not against a state or local agency, Section 2000e-5(e)(1) requires her to file a charge of discrimination with the EEOC within 180 days of the alleged unlawful employment practice. Altman's lengthy complaint includes multiple allegations of discriminatory misconduct and unlawful employment practices during her tenure with the Army from November 1991 until 1999. The alleged violations of Title VII and the ADEA in her complaint reflect the same allegations of discrimination and retaliation that were contained in her EEOC complaints before Judge Dickinson and her EEO complaints before the MSPB that were previously adjudicated or settled. The conduct at issue in those proceedings involved the alleged illegal promotion of Paul Rosensteel in 1992 and 1993, the alleged harassment by Carroll Correll from 1994 to 1995, the alleged wrongful "fair" rating on Altman's 1994 performance evaluation, and the alleged wrongful removal of Altman from her Program Analyst position in 1999. The complaint contains numerous related descriptions of discrimination and retaliation, but these allegations appear to be indistinguishable from the discriminatory and retaliatory conduct that was the subject of Altman's previous administrative proceedings. In addition, in the last paragraph of her complaint, Altman asserts, for the first time, that these misdeeds also violate the ADA and the Rehabilitation Act. For all of the allegations in her complaint, Altman does not allege any facts to indicate that she timely filed and exhausted her administrative remedies so as to establish the subject-matter jurisdiction of this court. On the face of the complaint, therefore, the subject-matter jurisdiction of this court to adjudicate Altman's employment discrimination claims cannot be established.

Looking beyond the face of the complaint, the court still cannot satisfy itself that it has subject-matter jurisdiction over the bulk of Altman's claims. Based on the evidence in the record, the only claims for which Altman has timely filed and exhausted her administrative

Case 5:11-cv-00061-MFU Document 58 Filed 04/09/12 Page 15 of 39 Pageid#: 1156

remedies are her allegation of harassment by Carroll Correll from 1994 to 1995 and her allegation of a wrongful rating of "fair" on her 1994 performance evaluation, both of which were before Judge Dickinson and adjudicated on the merits. Judge Dickinson determined that these charges of discrimination had been timely filed with the EEOC and were ripe for adjudication on the merits. The two other claims before Judge Dickinson, both concerning the alleged illegal promotion of Paul Rosensteel, are not timely. Judge Dickinson found these allegations by Altman to be not timely because Altman did not contact the EEO counselor at the facility within the regulatory forty-five-day mandatory time frame pursuant to Section 1614.105 before filing formal charges of discrimination with the EEOC. Moreover, Judge Dickinson found no reason, because of regulatory or other extenuating circumstances, to extend this forty-five-day mandatory time period for Altman. Thus, as untimely allegations of discrimination, Judge Dickinson dismissed these claims and did not adjudicate them on the merits.

At oral argument on January 23, 2012, the court spent a significant amount of time exploring the issue of exhaustion of administrative remedies because, during the hearing, Altman frequently referenced "fourteen complaints" that she had filed with the EEOC related to discriminatory conduct during her tenure with the Army. Altman, however, could not provide, and currently has not provided, any evidence indicating that these fourteen complaints were ever filed with the EEOC, let alone that they were timely filed and pursued through the administrative process. At oral argument Altman conceded that while she had brought fourteen complaints to the EEO counselor at the facility, she was unsure whether formal charges had actually been filed with the EEOC. The Army, likewise, has been unable to find any evidence of these alleged other formal charges of discrimination, and the court, through its own review of the record, cannot find any evidence of the timely exhaustion of these other fourteen complaints. Altman also has not

16

made any argument to the court, through her briefs or at oral argument, that the forty-five-day mandatory time frame for two of her claims before Judge Dickinson should have been extended because of extenuating circumstances.

Based on Altman's complaint, the pleadings and evidence in the record, and the parties' statements at oral argument, the only claims for which Altman has timely filed and exhausted her administrative remedies are her allegation of harassment by Carroll Correll from 1994 to 1995 and her allegation of a wrongful rating of "fair" on her 1994 performance evaluation that are included in EEOC cases 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X and 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X. All other particularized and generalized claims in Altman's lengthy complaint must be dismissed for failure to timely exhaust administrative remedies because Altman does not allege any facts to indicate that she has exhausted administrative remedies as to her claims and there is no evidence that the court can find in the record to demonstrate exhaustion.

## IV

Altman's complaint includes several allegations and references related to her removal from her Program Analyst position for unacceptable performance in 1999, her appeal of that decision to the MSPB, and her subsequent settlement agreement with the Army, in which Altman agreed to withdraw two pending EEO complaints concerning allegedly discriminatory conduct during Altman's upward mobility year and performance improvement plan period. As discussed above, the complaint, the pleadings and evidence in the record, and the parties' statements at oral argument fail to establish that Altman has timely exhausted her administrative remedies for these claims. However, even if Altman had timely exhausted her administrative remedies, any claims related to these incidents must be dismissed on the principles of accord and satisfaction and res judicata.

17

Accord and satisfaction is a common-law doctrine through which "'[a] claim is discharged . . . when some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim.'" O'Connor v. United States, 308 F.3d 1233, 1240 (Fed. Cir. 2002) (quoting Case, Inc. v. United States, 88 F.3d 1004, 1011 n.7 (Fed. Cir. 1996)) (internal quotations omitted). "In its most common form, an accord and satisfaction exists as 'a mutual agreement between the parties in which one pays or performs and the other accepts payment or performance in satisfaction of a claim or demand which is a bona fide dispute.'" Id. (quoting Nev. Half Moon Mining Co. v. Combined Metals Reduction Co., 176 F.2d 73, 76 (10th Cir. 1949)); F.T.C. v. Namer, No. 06-30528, 2007 WL 2974059, at *8 (5th Cir. 2007). The validity of accord and satisfaction requires four elements: "(1) proper subject matter; (2) competent parties; (3) a meeting of the minds of the parties; and (4) consideration." O'Connor, 308 F.3d at 1240; Holland v. United States, 621 F.3d 1366, 1382 (Fed. Cir. 2010), cert. denied, 132 S. Ct. 365 (2011).[11] The Fourth Circuit has held that "compromise and settlement is . . . a subset of the larger class of 'accord and satisfaction.'" Piver v. Pender County Bd. of Educ., 835 F.2d 1076, 1083 n.3 (4th Cir. 1987).

Altman's settlement agreement with the Army is an accord and satisfaction of her claims before the MSPB that she has re-alleged in her current complaint. Altman and the Army agreed to resolve the dispute concerning the Army's allegedly improper removal of Altman from her Program Analyst position. Moreover, Altman was represented by counsel during the settlement negotiations, and there has been no indication asserted by the parties that such counsel was ineffective in any way. Finally, settlement negotiations resulted in an agreement, signed by

---

[11] The Fifth Circuit Court of Appeals has held that "[t]he three essential elements to the confection of a valid accord and satisfaction are: (1) a disputed claim, (2) the debtor's tendering of a sum less than that claimed by the creditor, and (3) the creditor's acceptance of the payment." Namer, 2007 WL 2974059 at *8 (internal quotations omitted). The Fifth Circuit has also noted that "mutual consent is an absolute requisite to the formation of a contract of accord and satisfaction." Id. (internal quotations omitted).

Altman and the Army, in which the Army agreed to pay $59,000 and Altman agreed to dismiss two of her EEO complaints. The MSPB judge accepted the settlement and, as described previously, the record before the court and the assertions of the parties indicate that both parties properly performed their obligations under the settlement agreement. When Altman later claimed that the Army had violated the nondisclosure terms of the agreement, the MSPB and, subsequently, the Federal Circuit both rejected this assertion and affirmed the validity of the settlement agreement. Accordingly, based on the principle of accord and satisfaction, Altman is precluded from pursuing claims related to the MSPB proceedings in her current complaint because those claims have been fully satisfied by her settlement agreement with the Army.

Even if the court were to hold that Altman's settlement agreement with the Army was not a valid accord and satisfaction, Altman would still be precluded from re-alleging the relevant claims in her current complaint based on the doctrine of <u>res judicata</u>. "Res judicata . . . bars a party from suing on a claim that has already been litigated to a final judgment by that party or such party's privies and precludes the assertion by such parties of any legal theory, cause of action, or defense which could have been asserted in that action." <u>Ohio Valley Envtl. Coal. v. Aracoma Coal Co.</u>, 556 F.3d 177, 210 (4th Cir. 2009), <u>reh'g and reh'g en banc denied</u>, 567 F.3d 130 (4th Cir. 2009), <u>cert. dismissed</u>, 131 S. Ct. 51 (2010), (internal quotations omitted); <u>Montana v. United States</u>, 440 U.S. 147, 153 (1979) ("Under res judicata, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action."). The doctrine is meant to "protect 'litigants from the burden of relitigating an identical issue with the same party or his privy and [to promote] judicial economy by preventing needless litigation.'" <u>Laurel Sand & Gravel, Inc. v. Wilson</u>, 519 F.3d 156, 161-62 (4th Cir. 2008) (quoting <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S.322, 326 (1979)); <u>Montana</u>, 440 U.S. at 153 ("To preclude parties from

19

contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions."). For res judicata to apply, "three elements must be present: '(1) a judgment on the merits in a prior suit resolving (2) claims by the same parties or their privies, and (3) a subsequent suit based on the same cause of action.'" Ohio Valley Envtl. Coal., 556 F.3d at 210 (quoting Aliff v. Joy Mfg. Co., 914 F.2d 39, 42 (4th Cir. 1990)). Whether a subsequent suit is based on the same cause of action depends on "'whether the claim presented in the new litigation arises out of the same transaction or series of transactions as the claim resolved by the prior judgment.'" Laurel Sand & Gravel, 519 F.3d at 162 (quoting Pittston Co. v. United States, 199 F.3d 694, 704 (4th Cir. 1999)) (internal quotations omitted).

In this case, the validity of the settlement agreement between Altman and the Army has been upheld on the merits by the MSPB and the Federal Circuit. By including claims in this lawsuit related to her removal from her Program Analyst position, Altman seeks to relitigate claims that were part of that settlement agreement. There is no dispute that Altman's allegation regarding her removal from her Program Analyst position arises from the same events that were the subject of her settlement agreement with the Army and subsequent appeals to the MSPB and the Federal Circuit, both of which upheld the validity of the agreement.

Most importantly for purposes of res judicata, the decision by the Federal Circuit affirming the settlement agreement is a final judgment on the merits because the Federal Circuit has exclusive jurisdiction over Altman's appeal of the MSPB's final decision regarding the agreement. Title 28, Section 1295 explicitly states that the Federal Circuit "shall have exclusive jurisdiction . . . of an appeal from a final order or final decision of the Merit Systems Protection

20

Board . . . ." 28 U.S.C. § 1295(a)(9); <u>see</u> 5 U.S.C. § 7703(b)(1). The validity of Altman's settlement agreement with the Army has been conclusively established by the Federal Circuit, so that even if the settlement agreement is not a valid accord and satisfaction, this court does not have authority to re-adjudicate the issue. Accordingly, based on the principle of accord and satisfaction and the doctrine of <u>res judicata</u>, any allegations in Altman's complaint concerning her removal from her Program Analyst position and the related MSPB proceeding must be dismissed.

V

Because Altman has failed to timely exhaust her administrative remedies for the vast majority of the allegations in her complaint, and some of those claims are further barred by the principle of accord and satisfaction and the doctrine of <u>res judicata</u>, the only two claims properly before this court for adjudication are Altman's allegation of harassment by Carroll Correll from 1994 to 1995 and her allegation of a wrongful rating of "fair" on her 1994 performance evaluation in retaliation for her discrimination complaints. These are the two claims for which Altman timely exhausted her administrative remedies and for which Judge Dickinson ruled on the merits in the earlier EEOC administrative proceeding. The Army now seeks to dismiss these claims under Federal Rule of Civil Procedure 12(b)(6), or in the alternative under Federal Rule of Civil Procedure 56, and argues that Altman's complaint fails to state plausible claims for relief.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter which, accepted as true, "state[s] a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). This plausibility standard requires a plaintiff to

demonstrate more than "a sheer possibility that a defendant has acted unlawfully." Id. When ruling on a motion to dismiss, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). While the court must accept as true all well-pleaded factual allegations, the same is not true for legal conclusions. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 129 S. Ct. at 1949. Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 1950. When the court considers matters outside the pleadings, a Rule 12(b)(6) motion "shall be treated as one for summary judgment and disposed of as provided in Rule 56." Laughlin v. Metro. Wash. Airports Auth., 149 F.2d 253, 260-61 (4th Cir. 1998) (internal quotations omitted); see FED. R. CIV. P. 12(d).

Under Rule 56, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Nguyen v. CNA Corp., 44 F.3d 234, 236-37 (4th Cir. 1995). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## A

Altman's first claim properly before the court is for discriminatory harassment by Carroll Correll in violation of Title VII and the ADEA. The allegations of harassment are sprinkled throughout Altman's complaint and often appear to be infused with other allegations surrounding Altman's retaliation claim or claims for which this court does not have jurisdiction, as discussed above. Judge Dickinson, however, determined that the relevant period for Altman's harassment claim was from 1994 to 1995, and Altman has not disputed this factual finding. At oral argument on January 23, 2012, when Altman was asked to describe the essence of her harassment claim, Altman told the court that Carroll Correll harassed her after she asked for a promotion and the promotion was instead given to Paul Rosensteel, allegedly because of nepotism. Altman then briefly stated that she was the only woman working in the Audit Office and was older than most of the other employees, ostensibly seeking to bring her allegations within the ambit of Title VII and the ADEA.

"Title VII prohibits employers from discriminating against an employee based on sex with respect to the terms, conditions, or privileges of employment." Glover v. Oppleman, 178 F. Supp. 2d 622, 636 (W.D. Va. 2011). Generally, to establish a Title VII claim for sexual harassment, "a plaintiff employee must prove that (1) the subject conduct was unwelcome; (2) it was based on the plaintiff's sex; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." Hopkins v. Baltimore Gas and Elec. Co., 77 F.3d 745, 753 n.4 (4th Cir. 1996); see Hartsell v. Duplex Products, Inc., 123 F.3d 766, 772 (4th Cir. 1997); Okoli v. City of Baltimore, 648 F.3d 216, 220 (4th Cir. 2011). However, "[n]ot all sexual harassment that is directed at an individual because of his or her sex is actionable." Hopkins, 77

23

F.3d at 753. Title VII is not intended "to purge the workplace of vulgarity. . . . Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview." Id. (internal citation and quotations omitted); see Glover, 178 F. Supp. 2d at 637 (claim for hostile workplace harassment must prove the following elements: "(1) the harassment was because of sex; (2) the harassment was unwelcome; (3) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) some basis exists for imputing liability to the employer"). The severity of the harassment "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all of the circumstances. . . . [This] inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by the target." Glover, 178 F. Supp. 2d at 637 (quoting Oncale v. Sundowner Offshore Services, 523 U.S. 75, 81-82 (1998)).

Similar to Title VII, the ADEA makes it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ." 29 U.S.C. § 623(a)(1). A discrimination claim under the ADEA requires "some adverse employment action by the employer," Bristow v. Daily Press, Inc., 770 F.2d 1251, 1254 (4th Cir. 1985), and the plaintiff "'must prove, by a preponderance of the evidence (which may be direct or circumstantial), that age was the "but-for" cause of the challenged employer decision.'" Bodkin v. Town of Strasburg, Va., No. 09-2167, 386 F. App'x 411, 413, 2010 WL 2640461, at **2 (4th Cir. June 29, 2010) (quoting Gross v. FBL Fin. Services, Inc., 557 U.S. 167, 129 S. Ct. 2343, 2351 (2009)). If an employee establishes a prima facie case for age discrimination, the burden shifts to the employer to "articulate a legitimate, non-

24

discriminatory reason for its adverse employment decision." Laber, 438 F.3d at 430. If the employer satisfies this burden, then the employee "must show that the articulated reason is a pretext for age discrimination." Id.

Altman has failed to state a plausible claim for discriminatory harassment in violation of Title VII or the ADEA because, while the complaint contains allegations of harassment by Carroll Correll, it is devoid of factual allegations connecting the harassing behavior to Altman's sex or age during the relevant time period of 1994 to 1995. After the previous administrative hearing, Judge Dickinson held that there was "no probative evidence connecting [Carroll] Correll's conduct" to Altman's sex or age and that, "[w]hile unpleasant, the working environment cannot be said to be so hostile as to violate the law." EEOC Findings and Conclusions, Dkt. # 1, Ex. 33, at 4-5. Altman's complaint before this court reads like an appeal from the administrative proceeding, with Altman expressing dissatisfaction with the evidentiary rulings by Judge Dickinson and the amount of compensatory damages awarded during the administrative proceeding. The complaint appears to reassert the same facts before Judge Dickinson at the time of her ruling, facts that were insufficient to establish plausible claims under Title VII or the ADEA in that proceeding, and does not allege new facts to independently support a claim for relief in this court.

Because of the deference given to pro se litigants, Altman was given an exhaustive opportunity at oral argument on January 23, 2012, to explain the basis for her discriminatory harassment claim. Altman described at great length the hiring and allegedly illegal promotion of Paul Rosensteel, her request for that promotion and the fact that her request was denied, the steps she took to complain about Paul Rosensteel and other complaints she made, the work environment at the facility after she began complaining, Carroll Correll's conduct toward her

25

after she began complaining, her disagreement with Judge Dickinson's ruling, and the amount of emotional and financial distress she has experienced as a result of the administrative and legal proceedings in this case. Altman's only reference to her sex and age came at the very end of her extensive narrative when she briefly mentioned that she was the only woman working in the Audit Department at the facility and that she was older than most of the other employees. Altman's allegations fail to make any connection between Carroll Correll's allegedly harassing conduct and her sex or age, thus failing to state a claim for relief under Title VII and the ADEA.

In <u>Bass v. E.I. DePont de Newmours & Co.</u>, 324 F.3d 761 (4th Cir. 2003), an African-American female employee over the age of forty filed a lawsuit against her former employer over an office dispute surrounding changes in her employment duties. <u>Id.</u> at 763-64. The Fourth Circuit held that the employee failed to adequately allege a claim for hostile work environment based on gender, race, and age discrimination, stating as follows:

> Bass' complaint is full of problems she experienced with her co-workers and supervisors. These facts, however, do not seem to have anything to do with gender, race, or age harassment. In fact, Bass' only allegations in support of her claim that deal with gender, race, or sex are as follows: She states that "[p]laintiff an African American female was consistently paid less than and consistently did not advance as fast as similarly situated white men." . . . In the claims section of her complaint, Bass asserts that DuPont engaged in the various acts of which she complains "because of her race and sex," . . . and later, "age[]" . . . .

<u>Id.</u> at 765. The court concluded that the facts alleged by the employee "merely tell a story of a workplace dispute regarding her reassignment and some perhaps callous behavior by her superiors. They do not describe the type of severe or pervasive gender, race, or age based activity necessary to state a hostile work environment claim." <u>Id.</u> As such, the employee's complaint failed to allege that the harassment she experienced was based on gender, race, or age

and that the harassment was sufficiently severe or pervasive to create a hostile environment, two necessary elements for establishing a plausible claim for relief. Id.[12]

Similarly, in Dickens v. MCI Telecommunications Corporation, No. 94-2494, 78 F.3d 578, 1996 WL 93810 (4th Cir. Mar. 5, 1996), the Fourth Circuit held that a forty-six-year-old African-American employee failed to establish a prima facie claim for age discrimination in violation of the ADEA because "Dickens offered no direct evidence to show that his age was a determining factor in the decision to reclassify him." Id. at *3. The court stated that "[t]he only circumstantial evidence of age discrimination Dickens offered was his belief that the other three Senior Managers in Network Services were younger than he, and the fact that he was required to report to Michael Donnell, who is younger than Dickens." Id. However, even if this belief were correct, the court concluded that this circumstantial evidence did not make it reasonably probable that, but for his age, Dickens would not have been reclassified. Id. at *4.

In this case, while the court construes all facts and reasonable inferences presented in the complaint and at oral argument in the light most favorable to Altman, her conclusory statements regarding her sex and age as compared to her fellow employees, as in Bass and Dickens, are insufficient to establish a plausible claim for relief. Moreover, the box of exhibits submitted by Altman, see Dkt. # 30, which the court has reviewed, fail to provide the necessary support for her

---

[12] In Causey v. Balog, 162 F.3d 795 (4th Cir. 1998), the Fourth Circuit held that a sixty-two-year-old Caucasian male employee failed put forth a prima facie case of hostile work environment based on race and age discrimination. Id. at 801. Although the evidence described several incidents in the workplace, the court stated as follows:

> [T]here is no indication that any of the incidents complained of were the result of Causey's supervisors' animosity toward his race or age. . . . Causey has failed to present any evidence suggesting Montgomery's conduct was motivated by Causey's race or age. Montgomery never made any derogatory comments about Causey's race or age, and nothing about his conduct suggests it was based on these factors.

Id. The court noted that "Causey made conclusory statements that Montgomery treated him less favorably than younger black and white employees of similar rank" but concluded that these "conclusory statements, without evidentiary support, cannot support an actionable claim for harassment." Id. at 801-02.

claim of discriminatory harassment for the relevant time period of 1994 to 1995.[13] These exhibits describe Carroll Correll as a rude, overbearing, and critical supervisor who created an unenjoyable and tense work environment, but the exhibits do not sufficiently connect this behavior to Altman's sex or age.[14] In fact, the exhibits indicate that Carroll Correll's conduct

---

[13] Altman sent the court a large box of documents on December 7, 2011, that accompanied her memorandum in opposition to the Army's motion to dismiss or, in the alternative, motion for summary judgment. While the documents appear to be a copy of discovery sent by Altman to the Army, the court has considered the documents as exhibits attached to Altman's memorandum in opposition to the Army's motion. The documents were too voluminous to file electronically, so the Clerk's Office noted this in the record and has since maintained the documents in its office. The court has thoroughly reviewed these documents on multiple occasions throughout its consideration of Altman's claims and the drafting of this opinion. Because of the court's consideration of the entirety of the voluminous filings in this case, including the box of documents submitted by Altman, this aspect of the court's decision is properly treated as a motion for summary judgment and disposed of as provided in Rule 56. See FED. R. CIV. P. 12(d).

[14] An undated memorandum written by Altman describes how she believes she was treated after Paul Rosensteel was promoted: "Mr. Rosensteel was given favored preferential treatment and I was treated disparately when I asked to become an Auditor by Mr. Carroll Correll yelling at me, making slashing comments towards me, and writing a counseling statement on why he would not fulfill my request to be hired as an Auditor . . . . This counseling statement is dated 01 Jun 92." The court has included a summary of Carroll Correll's comments in that counseling statement in footnote 19. The court also notes that these allegations by Altman do not appear to occur within the applicable time period of her discriminatory harassment claim, which is from 1994 to 1995. This same memorandum written by Altman includes other allegations of Carroll Correll's conduct toward her for which the time period is unclear: (1) "Mr. Carroll Correll changing my job description and then writing objectives that did not match my job current job description;" (2) "Mr. Carroll Correll placing absolutes in my objectives, having to endure threats and coercion by Mr. Carroll Correll that he had total power and control over my appraisals and harassing me that I should do whatever he wanted me to do at the time;" (3) "Suffering reprisal and retaliation from Mr. Carroll Correll because of his time card abuse, being placed under duress to attend meetings interoffice and with management over issues on time card abuse and time and paperwork involved preparing for those meetings;" and (4) "Being yelled at, cursed at, and threatened consistently by my supervisor over time issues, appraisal issues, issues on setting up objectives, excellence levels for proper grading of appraisals, absolutes being placed on my appraisals issues, dealing with high expectations on appraisals that could not reasonably be attained issues, having to accept the way an appraisal was graded being changed midstream from a quantitative to a subjective or qualitative measurement for the year when the appraisal was given." None of these allegations, or any of the other allegations in this particular memorandum, reference Altman's sex or age.

A declaration dated February 6, 1996, by Ben Welch, who appears to be one of Altman's co-workers, states as follows: "Mr. Correll always needed to be attacking someone. If he couldn't find an auditor to attack, he would turn on his subordinates. Brenda [Altman] would have to tolerate his temper tantrums. He slammed doors and threw things in the office. . . . Mr. Correll's work area was always disorganized and he would lose papers every day, then yell at Brenda to find them." Later in the declaration, Ben Welch states that he quit his job with the Army in January 1994, which means that the allegations in his declaration likely occurred before the relevant time period of Altman's discriminatory harassment claim, which is from 1994 to 1995.

In an undated memorandum written by Altman she states the following about Carroll Correll: "I feel that he resented hiring me off the Priority Placement Program and he was trying to make it as hard as he could for me to accomplish the standards he was putting forth for me. My standards as they are written are unreasonable; some of the items are humanely impossible to perform. There are too many absolutes where there is little room for error which is also not humanely possible. . . . I am placed under continual pressure to perform at 100% accuracy 100% of the time. He gives me a job to do and then tries to rush me through it and wants to grab the paperwork before I've had time to check it. Then he frets if there's an error in it. . . . Since coming here, he has been trying to capitalize on

was often directed at several employees within the Audit Department, regardless of sex or age, and not just Altman alone.[15]  While the exhibits describe a few comments by Carroll Correll

---

what skills I don't have instead of what skills I do have.  He refuses to take time to give me any training in the areas in which I am weak or unknowledgeable.  I need training and constructive feedback, practice in doing my job accurately. . . . He doesn't train me on proper procedure, yet complains that I'm making errors.  Many of the mistakes could have been avoided if I had been trained properly. . . . Mr. Correll is often vague.  He talks in circles and only gives partial instructions. . . . He expects me to read his mind and go search for the remaining information, when explaining it himself to you would have saved a lot of time and effort and would avoid a lot of errors. . . . Mr. Correll hands things back to me two or three times because he keeps making his revisions to the document. . . . Mr. Correll . . . *stands in the outer office reprimanding me publicly for the least little error I make or even if I think wrong to a question he ask*.  Usually when I do make an error, it's because of him - - not telling me how to do it to start with.  I have to work under too much pressure and emotional strain."  It is unclear from this memorandum whether this conduct by Carroll Correll occurred during the applicable time period of Altman's discriminatory harassment claim, which is from 1994 to 1995.

Another undated memorandum written by Altman describes conduct by Carroll Correll that appears to occur in 1995, including the following: "Mr. Correll was determined to do anything he could do to give me a lower grade on my appraisals because he did not like having an older woman as an employee. . . . [He w]ould remove items from my work area, out [of] the trash, off my desk, draft stage documents from the printer and would Xerox these to mark up for errors, would confiscate drafted documents from my work area, run to the Xerox and keep these. . . . Correll would change the formats in documents I had proofread, removing words, changing paragraph numbering or page numbering or leaving out words in hopes of catching me in an error if I did not catch all those changes to the document. . . . Mr. Correll would misreport his time and then I was dragged into the Executive Office over it and given a personnel regulation on lying about a supervisor. . . . [There were t]hree instances of profanity for my reporting Correll for filling out his leave slip with the incorrect times on it. . . . Because I had reported Correll for misreporting his time in early April 95, he handed me a CETAL regulation on timekeeping and asked me to date and sign it."

[15] A declaration dated March 13, 1997, by James Adams, who appears to be one of Altman's co-workers, states that "[i]t is common knowledge among management and employees within this office that Mr. Correll has a pompous and arrogant attitude toward many of his subordinates.  It is known that other employees have had a problem with Mr. Correll.  It is rumored that Mr. Fran Susie won a complaint against Mr. Correll through the Office of Special Counsel."  It is unclear from the declaration whether this conduct by Carroll Correll occurred during the applicable time period of Altman's discriminatory harassment claim, which is from 1994 to 1995.

A declaration dated February 6, 1996, by Ben Welch, who appears to be one of Altman's co-workers, states as follows: "Mr. Correll made the statement 'my day is not complete unless I write someone up.' . . . The entire office strained to function under a hostile work environment.  Mr. Correll went through employee's desks and called them at home to the extent that I kept an unlisted telephone number.  Brenda [Altman], [Mr.] Fran Susie, and I were all given unfair performance evaluations.  After a 12-year federal career, I quit my job in January 1994 because of the harassment, discrimination and uncontrollable temper of Mr. Correll.  Many others have passed through the Audit Office and ran from the hell created by Mr. Correll.  Mr. Correll had several female subordinates either resign or seek a transfer prior to Brenda Altman taking this position.  Mr. Correll should be removed from any supervisory function because he just does not have the ability."  Because Ben Welch states that he quit his job with the Army in January 1994, the allegations in his declaration likely occurred before the relevant time period of Altman's discriminatory harassment claim, which is from 1994 to 1995.

In an undated memorandum written by Altman, she states as follows: "Mr. Correll openly and publicly brags about the people he's let go or fired. . . . Mr. Correll expounds about ruining people and messing up their lives. . . . The working relationship is anything but relaxed.  There is no teamwork.  There is only resentment.  He is constantly running to his computer to write up the employees he doesn't like.  He has already had one of his auditor's, Ben Welch, file a grievance against him. . . . Mr. Correll shows favoritism to two of his employees and exhibits sodomy towards the rest of the office. . . . Mr. Correll is a bully and loves bombarding others.  He kind of gets a kick out of doing it.  He loves to argue and to argue with him is a no win situation.  He makes sure you know he thinks he [is] always right.  He gloats on getting everything his way and if he don't get it his way, he's a pouting

Case 5:11-cv-00061-MFU   Document 58   Filed 04/09/12   Page 29 of 39   Pageid#: 1170

referencing Altman's sex and age, these comments do not amount to the type of severe or

pervasive behavior needed to demonstrate a hostile work environment.[16] The exhibits also do

---

child. He's a hostile aggressive know it all. He doesn't mind throwing tantrums when situations go wrong. He [is] a head strong, opinionated, hot headed, hard hearted, hard head." It is unclear from this memorandum whether this conduct by Carroll Correll occurred during the applicable time period of Altman's discriminatory harassment claim, which is from 1994 to 1995.

[16] Altman claims that when she asked to go on a business trip to Saudi Arabia, Carroll Correll told her that "women in Saudi have to ride on the back of the bus" and that she "wouldn't like it over there." In an undated memorandum written by Altman she states the following about Carroll Correll: "I feel I never had a prayer in the world to please Mr. Correll just because I'm a woman and because of my age and race. Frequently, he has made adverse comments belittling women." It is unclear from the memorandum whether such comments occurred during the applicable time period of Altman's discriminatory harassment claim, which is from 1994 to 1995. In another undated memorandum written by Altman she states that Carroll Correll made the following comments to her: (1) "Told to make cookies and coffee so that I might get a good appraisal;" (2) "Called me the housekeeper when Audit Officer folders were stack[ed] on the Conference table;" (3) "Sometimes you don't get the best people off the Priority Placement Program, but we are not secretaries and we don't wear skirts;" and (4) "The next person I am going to hire will be a black man or a young white girl." It is unclear from the memorandum whether such comments occurred during the applicable time period of Altman's discriminatory harassment claim, which is from 1994 to 1995.

A declaration dated February 6, 1996, by Ben Welch, who appears to be one of Altman's co-workers, states as follows: "Mr. Correll sexually discriminated against Brenda [Altman] regularly, saying 'she should cook cookies and bring them in the office for him.' Mr. Correll implied that, because Brenda was female, she couldn't travel overseas and do audit work. Mr. Correll openly expressed his pleasure with the fact that in Saudi, Arabian men own their women; keep them in their place; and that's how women should be treated. . . . Several times I remember Mr. Correll threatening to downgrade or replace her. He threatened to fire or terminate her about once a week. . . . Mr. Correll commented regularly that the next person he hired will be a white man or a young black girl. Mr. Correll has made degrading remarks about Brenda's age. Mr. Correll implied that, because Brenda was older and female, she would never be an Auditor under him." Later in the declaration, Ben Welch states that he quit his job with the Army in January 1994, which means that the allegations in his declaration likely occurred before the relevant time period of Altman's discriminatory harassment claim, which is from 1994 to 1995.

These comments referencing Altman's sex or age, whether or not they occurred during the relevant time period for Altman's discriminatory harassment claim, are not severe or pervasive enough to create an objectively hostile or abusive work environment. Carroll Correll's affirmative statements regarding Altman's sex or age can be summarized as follows: (1) she would not like Saudi Arabia because women ride on the back of the bus; (2) Saudi Arabian men own their women and keep them in their place, and that is how women should be treated; (3) Altman should make cookies and coffee; (4) Altman is the housekeeper in the Audit Office; (5) a statement about secretaries and wearing skirts; and (6) the next person hired would be a white or black man (race is unclear) or a young white or black girl (race is unclear). Carroll Correll also allegedly implied that because Altman was an older woman, she would not be hired as an auditor, but memoranda written by Carroll Correll referenced in footnote 19 provide affirmative reasons for why Altman was not hired as an auditor. While other allegations in the exhibits state in general terms that Carroll Correll made degrading or belittling statements about Altman or women in general, no other specific statements have been provided to the court. Additionally, there are no allegations of inappropriate physical contact between Carroll Correll and Altman or any suggestions of sexual contact or sexual activity by Carroll Correll to Altman. Although the exhibits clearly demonstrate that Carroll Correll harassed and intimidated Altman and other employees, there is insufficient evidence to establish that he did so based on sex or age, and the affirmative statements he made are not severe or pervasive enough to create a hostile work environment.

In Kidwai v. McDonald's Corporation, No. 93-1720, 21 F.3d 423, 1994 WL 136971 (4th Cir. Feb. 9, 1994), the Fourth Circuit found that similar statements as those alleged by Altman lacked "the severity necessary to make out a Title VII sexual harassment claim." Id. at *3. The statements in Kidwai were made by a male supervisor to a female employee and included the following: (1) noting that the employee had a new boyfriend; (2) calling the employee at home and asking her if she was in bed with someone; (3) asking the employee if she would like to meet his mother; (4) asking the employee how her vacation had been and whether she had had a good time

Case 5:11-cv-00061-MFU   Document 58   Filed 04/09/12   Page 30 of 39   Pageid#: 1171

not support Altman's contention that she was passed up for promotion in favor of Paul Rosensteel because of her sex or age.[17] On the contrary, the exhibits submitted by Altman include various documents detailing legitimate, nondiscriminatory reasons for the selection of Paul Rosensteel for the relevant position, such as his prior experience and ability to work unsupervised.[18] There are also recorded reasons for why Altman was not chosen for the position that do not relate to her sex or age, such as her need for training and supervision.[19]

---

and telling the employee "three of four times that he had missed her;" (4) asking the employee "what she liked to do to have a good time" and volunteering "that he personally liked to stay home and to read books or to watch television;" and (5) asking the employee "if she would cook dinner for him after she moved into her new home," which the employee "interpreted as a request for sex." Id. at *1. The supervisor also drove too fast one time while he and the employee were in his car, which scared the employee to tears, and on one occasion he used profanity when asking the employee, "'Who the hell do you think you are?' and 'What the f- - - do you think you've been doing for the last year?'" Id. The Fourth Circuit held that, when "viewed in its totality and in the light most favorable to the nonmoving party," the supervisor's allegedly harassing conduct, while it might have been offensive and ungraceful, "was not severe or pervasive enough to create a work environment that a reasonable person would find hostile or abusive." Id. at *4.

Similarly, in Saran v. Harvey, No. 05-727, 2006 WL 1049157 (E.D. Va. Apr. 17, 2006), aff'd, No. 06-1624, 201 F. App'x 165 (4th Cir. Sept. 28, 2006), the United States District Court for the Eastern District of Virginia found that statements by a supervisor to an Army employee were not based on the employee's "age, gender, or the national origin of her spouse" and that even if they were, the conduct was "not sufficiently severe or pervasive" to establish a claim for a hostile work environment. Id. at *10. The supervisor's comments included the following: (1) questioning the employee's loyalty to the United States; (2) questioning how the employee "could have a security clearance when she had a Turkish husband;" (3) referring to the employee "as an 'old bag' or an 'old hag;'" (4) saying "'that old Saran is married to a Turkish guy and how does she have security clearance;'" (5) referring to the employee "as a 'selfish old woman;'" (6) asking the employee, "'When are you leaving? Whenever it is, it is not soon enough;'" and (7) commenting "that 'like bad news, Mrs. Saran does not improve with age.'" Id.

[17] The court notes that the hiring of Paul Rosensteel is alleged to have occurred in 1992 and 1993, but Judge Dickinson determined that the relevant time period for Altman's discriminatory harassment claim under Title VII and the ADEA was from 1994 to 1995. Therefore, the Paul Rosensteel situation should not be relevant to Altman's discriminatory harassment claim, especially since Judge Dickinson dismissed similar complaints as untimely. Altman's allegations of unfairness related to the hiring and employment of Paul Rosensteel, however, are often undated and vague. Thus, the court addresses these allegations in case any conduct by Carroll Correll related to the hiring and employment of Paul Rosensteel could have occurred between 1994 and 1995 and because some of the exhibits indicate that Altman continually sought an auditor position even after Paul Rosensteel was hired.

[18] A memorandum written by Carroll Correll on April 8, 1992, summarizes his reasons for hiring Paul Rosensteel: "We hired this person based on a face-to-face interview. The SF-171 was very general in nature and, on the narrative in the 171, he would not have met our criteria. The interview sold us, however! . . . This individual is filling a highly technical, visible, and structured position which demands little or no supervision by the Chief of the Audit Office. . . . The person filling the role has the prerequisite years of successfully performing this type of work at a high level of organizational hierarchy."

An undated memorandum written by Altman describes nepotism, not sex or age, as the reason for hiring Paul Rosensteel: "Mr. Rosensteel befriended COL Miller and walked in the trailer back door of the Auditor Office and got hired almost immediately. Paul said to Ben when I was listening that the reason he got hired was because he and COL Miller were friends." This memorandum by Altman also states that Paul Rosensteel was hired because he

31

The overwhelming bulk of exhibits submitted by Altman do not support her allegations of discriminatory harassment and instead paint a picture of Altman as an employee who often failed to produce quality work and then blamed such failures on lack of training or the actions of her superiors, as well as an employee who became overly involved in matters that were not her concern and who needed unreasonable amounts of supervision. To be sure, the picture painted of Carroll Correll is no better. It is clear from the bulk of exhibits submitted by Altman that Carroll Correll was disliked by many employees, including Altman, because of his critical, intimidating, and negative comments and actions toward his subordinates. Importantly, however, the exhibits as a whole do not suggest that Carroll Correll acted this way toward his employees, and particularly toward Altman, because of their sex or age, or because of any other protected status, and such a connection is necessary to support a claim for discriminatory

---

was "friends with COL Miller at church . . . ." In a letter written by Altman in 1997 to Cheryl Vinci, Director of Human Resources at the headquarters of the U.S. Army Corps of Engineers, Altman claims that Paul Rosensteel admitted to her that nepotism was the reason he was hired: "Mr. Rosensteel, who was formerly unemployed and bankrupt from a clothing retail business, later admitted to me and other audit staff, that by befriending COL Miller at church, he was hired illegally."

[19] A summary written by Carroll Correll on June 1, 1992, states that when Altman asked to be hired and trained as an auditor instead of Paul Rosensteel, Carroll Correll responded as follows: "I was hesitant to reconvert another of my auditor slots to a trainee slot since I needed experienced people who I could send out to do reviews without supervision. She was insistent that I was hiring people and training them. . . . I then explained Paul R's experience which negated a long training period." The court notes that this summary was not written within the applicable time period of Altman's discriminatory harassment claim, which is from 1994 to 1995.
   In an undated memorandum written by Altman, she states that on March 11, 1994, she asked Carroll Correll why she could not be hired as an auditor, and he responded as follows: "Correll told me that he would never have hired me if I had not been on the priority placement program. He said he would have hired someone over in the building instead. Correll also said I was a very hard worker and doing a very good job as an Audit Assistant, but if I became an auditor, I would be just like [Mr.] Fran [Susie] and be doing nothing."
   In a memorandum written by Carroll Correll to Altman on May 18, 1994, Carroll Correll states his reasons for not hiring Altman as an auditor: "Based on the size of the Audit Office, I just don't have the time to train someone from scratch to be an auditor. . . . I need someone with experience that I can send to our overseas programs with a minimum of supervision. If I somehow was able to hire you as an auditor, then I would also have to hire and train someone to take your Auditor Assistant position. I also can't afford the time to train two people in new positions." Another memorandum written by Carroll Correll, this one undated, states the following: "I told her that I wouldn't hire her as an auditor for I needed someone with experience so that I could send to our AOR to do unsupervised work. I also told her that she was too prone to make errors which is a negative trait for an auditor." Finally, in a memorandum written by Carroll Correll on May 29, 1994, he states as follows: "I explained to Ms. Altman why I would not like to hire an entry level person. That I needed someone who could go into our AOR and perform audits."

32

harassment.  Accordingly, because Altman's claim for discriminatory harassment by Carroll Correll fails to contain the requisite linkage to her sex or age, it must be dismissed.

**B**

Altman's second claim before the court is for retaliation in violation of Title VII and the ADEA.  Altman claims that she was given a wrongful rating of "fair" on her 1994 performance evaluation in retaliation for her discrimination complaints.  In the previous administrative proceeding, Judge Dickinson found that this claim had merit, and Altman was awarded compensatory damages and reasonable attorney's fees.  As mentioned above, Altman's complaint in this court reads like an appeal of that ruling, and Altman clearly disagrees with the amount of compensation she received at the administrative level.  As a separate legal action, Altman's complaint before this court must state an independent basis for relief.  Like her claim for discriminatory harassment, Altman's retaliation claim in this court references the proceedings before Judge Dickinson.  Although the complaint mentions the word "retaliation," or some variation thereof, at various points, the context within which the word is used appears to be in relation to Altman's discriminatory harassment claim or claims for which this court does not have jurisdiction, as discussed above.[20]  The only claim of retaliation for which Altman has properly exhausted her administrative remedies, and thus over which the court has jurisdiction, is her allegation of a wrongful "fair" rating on her 1994 performance evaluation in retaliation for her complaints of discrimination.  It is this allegation that the Army now seeks to dismiss for failure to state a claim for relief.

---

[20] Altman's complaint includes several allegations of retaliation by Carroll Correll against her, including not giving her credit for her hard work, stealing things from her desk, stealing her keys, stalking her, breaking into her car, cursing at her, threatening to change her job title or job description, threatening to take personnel actions against her or withhold pay increases, and threatening to lower her ratings on appraisals.  Complaint, Dkt. # 1, Ex. 28, at 16-17. However, as discussed above, Altman has failed to exhaust her administrative remedies for these claims, so the court does not have jurisdiction to adjudicate them.

Case 5:11-cv-00061-MFU   Document 58   Filed 04/09/12   Page 33 of 39   Pageid#: 1174

As described above, Title VII forbids employment discrimination against an individual based on their "race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). The anti-retaliation provision of the statute "prohibits an employer from 'discriminat[ing] against' an employee . . . because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 56 (2006) (quoting 42 U.S.C. § 20000e-3(a)). "The ADEA, like Title VII, prohibits an employer from retaliating against an employee who has opposed unlawful discrimination." Johnson v. Mechanics & Farmers Bank, No. 07-1725, 309 F. App'x 675, 685, 2009 WL 188077, at **9 (4th Cir. Jan. 23, 2009). As described previously, the ADEA prohibits employment discrimination based on age. 29 U.S.C. § 623(a). The anti-retaliation provision of the statute makes it "unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . made a charge . . . or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d).

The Fourth Circuit has held that "[t]he elements of a prima facie case of retaliation are (1) the plaintiff engaged in a protected activity, (2) the employer took an adverse employment action against the plaintiff, and (3) a causal connection existed between the protected activity and the adverse employment action." Johnson, 309 F. App'x at 684, 2009 WL 188077 at **8 (citing Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989)); see Anderson v. G.D.C., Inc., 281 F.3d 452, 458 (4th Cir. 2002). Once this prima facie case is established, "the employer may rebut it by presenting evidence of a legitimate, non-retaliatory reason for the adverse action." Id.

34

If the employer is able to present "evidence of its legitimate, non-retaliatory reason, the burden shifts back to the employee to show that the employer's proffered reason is pretextual." Id.

In Burlington, the plaintiff claimed that her employer violated Title VII by retaliating against her for complaining about workplace sexual harassment by reassigning her duties and later suspending her without pay. 548 U.S. at 58-59. The Supreme Court held as follows:

> [T]he antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur in the workplace. . . . [T]he provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant. . . . [T]hat means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.

Id. at 57. The Burlington Court stated that "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace." Id. at 63 (emphasis in original). The Court stressed that the adversity suffered by the employee must be material, and the harm suffered by the employee must be judged according to an objective standard of reasonableness. Id. at 68-69. The Court further noted as follows:

> [T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. . . . A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

Id. at 69 (internal quotations and citations omitted). Applying these principles to the facts of the case, the Burlington Court held that "there was a sufficient evidentiary basis to support the jury's verdict on . . . [the plaintiff's] retaliation claim." Id. at 70.

In this case, Altman's retaliation claim is solely based on a 1994 performance evaluation in which she was given a rating of "fair" instead of "successful," allegedly in response to the initiation of her discrimination complaints. Altman does not allege any negative consequences as a result of this performance evaluation, such as the denial of a promotion or other pay increase, a reassignment of duties, exclusion from meetings or training programs,[21] or any other change in the status, conditions, or environment of her employment with the Army. The retaliation allegation properly before the court only states that Altman's performance at work was rated "fair" instead of "successful," as she had been rated on previous performance evaluations. It is within this context that the significance of this act of retaliation must be considered, in light of the standard expressed in Burlington and the state of the law in the Fourth Circuit, to determine whether a negative performance evaluation alone is a materially adverse employment action that would deter a reasonable employee from complaining about discrimination.

In the Fourth Circuit, a negative performance evaluation alone, without any accompanying injury or change in the terms or conditions of employment, is insufficient to constitute a materially adverse employment action in order to establish a cause of action for retaliation in violation of Title VII and the ADEA. In Parsons v. Wynne, No. 06-1876, 221 F.

---

[21] Altman did state at oral argument on January 23, 2012, that one of the ways Carroll Correll would harass and retaliate against her after she was denied her requested promotion and began complaining of discrimination was to not allow her to travel or take educational courses like other employees were allowed to do. However, Altman did not indicate in any way that these missed opportunities were associated with her 1994 performance evaluation. Moreover, as an independent allegation of retaliation, Altman has failed to exhaust her administrative remedies for any potential claim based on missing travel and educational opportunities.

App'x 197, 2007 WL 731398 (4th Cir. Mar. 9, 2007), the Fourth Circuit held that neither an

employee's negative "performance evaluation nor her removal from the alternate work schedule

would have 'dissuaded a reasonable worker from making or supporting a charge of

discrimination.'" Id. at 198, 2009 WL 731398 at *1 (quoting Burlington, 548 U.S. at 68). In

that case, an Air Force employee claimed that the Secretary of the Air Force retaliated against

her for engaging in protected activity under Title VII by giving her an unfair performance

evaluation, which caused her not to receive a discretionary financial bonus, and removing her

from the alternate work schedule that was available to employees. Nasis-Parsons v. Wynne, No.

4:05-36, 2006 WL 155913, at * 1-2, 5 (E.D. Va. June 1, 2006). These adverse employment

actions, however, were not found to be material enough to dissuade a reasonable worker from

pursuing a charge of discrimination, so the retaliation claim was dismissed. Parsons, 221 F.

App'x at 199, 2009 WL 731398 at * 1. District courts within the Fourth Circuit have also held

that a negative performance evaluation, both by itself and along with other adverse employment

actions, is not enough to establish a retaliation claim. See Amaram v. Va. State Univ., No. 3:07-

396, 2008 WL 876966, at *3 (E.D. Va. Mar. 31, 2008) (holding that the negative performance

evaluation of a university professor was not an adverse employment action because, although the

professor temporarily received a reduced salary after the evaluation, he received retroactive pay

and an upgrade in his performance rating after successfully appealing the evaluation to the

applicable faculty committee, so the retaliatory act was not materially adverse); Fernandez v.

Alexander, No. 04-3009, 2007 WL 2475870, at *1 (D. Md. Aug. 27, 2007), aff'd, No. 08-1118,

307 F. App'x 725, 2009 WL 59156 (4th Cir. Jan. 12, 2009), cert. denied, 129 S. Ct. 2778 (2009)

(holding that the adverse employment actions alleged by the plaintiff, including receiving a

"leave letter," performance evaluations that were not as good as the plaintiff wanted, the

employer denying the plaintiff access to certain employment resources, and the employer complaining about the plaintiff in relation to his discrimination claims, were not material enough to dissuade a reasonable employee from pursuing a discrimination claim); Watson v. Snow, No. 103-00394, 2006 WL 753185, at * 7 (M.D.N.C. Mar. 20, 2006), aff'd as modified, No. 06-1471, 229 F. App'x 205, 2007 WL 1062844 (4th Cir. Apr. 10, 2007) (holding that a negative performance evaluation was not enough to establish a retaliation claim because the employee did not present any evidence that his title, pay grade, benefits, salary, or eligibility for bonuses or promotions were affected as a result of evaluation).

In Nye v. Roberts, No. 03-1683, 145 F. App'x 1, 2005 WL 1870027 (4th Cir. Aug. 5. 2005), a pre-Burlington opinion, the Fourth Circuit held that a negative performance evaluation was enough to establish a retaliation claim. Id. at **4-5. The court noted, however, that this performance evaluation was immediately preceded by a reprimand letter and was the result of a series of other retaliatory acts by the employer to progressively discipline the employee for pursuing her discrimination claim. Id. at **3-5. Thus, the court found that, in this context, "a reasonable jury could find that . . . the reprimand and performance evaluation resulted in a material change" in the plaintiff's employment status. Id. at **4.

In light of this case law, Altman's allegation of a single wrongful performance evaluation, without any accompanying retaliatory acts or negative employment consequences, is insufficient to establish a prima facie case for retaliation because it is not materially adverse enough to dissuade a reasonable employee, such as Altman, from pursuing her discrimination claims. Altman's complaint contains fewer ripe allegations of adverse employment action and accompanying negative employment consequences than the plaintiffs' allegations in Parsons, Amaram, and Watson, all of which were themselves insufficient to support claims of retaliation.

Likewise, unlike the plaintiff in Nye, who was able to establish a plausible claim for relief, Altman's complaint does not allege a series of progressive retaliatory actions culminating in a negative performance evaluation. Even though Altman succeeded on her retaliation claim before Judge Dickinson, this matter is a separate and independent legal action, and Altman's complaint must establish a claim for retaliation based on the law to which this court is bound. Altman's retaliation claim based on her 1994 performance evaluation, her final claim before this court, fails to meet this standard and must be dismissed.

## VI

Accordingly, **IT IS ORDERED** that the Army's **Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (Dkt. # 18)** is **GRANTED**, and Altman's claims are **DISMISSED WITH PREJUDICE**. Moreover, **IT IS FURTHER ORDERED** that the parties' remaining motions **(Dkt. #s 34, 36, 41, 46, 47, and 57)** are **DENIED AS MOOT**. The Clerk is directed to send a copy of this Memorandum Opinion and accompanying Order to pro se plaintiff and counsel for defendant.

Entered: April 9, 2012

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge

39